944 P.2d 1026 (1997)
133 Wash.2d 314
STATE of Washington, Respondent,
v.
Roderick HAMLET, Petitioner.
No. 64620-1.
Supreme Court of Washington, En Banc.
Argued June 10, 1997.
Decided October 9, 1997.
*1027 John Quirk, Michele Shaw, Seattle, for Petitioner.
Norm Maleng, King County Prosecutor, Lee Yates, Deputy, Seattle, for Respondent.
Jeffrey Ellis, Defender Ass'n, Seattle, for amicus Washington Ass'n of Criminal Defense.
MADSEN, Justice.
The jury convicted Defendant of first degree assault, rejecting his claim of diminished capacity. Defendant contends the trial court erred in ordering disclosure of the *1028 name and reports of a defense retained psychiatrist who examined Defendant on the issue of diminished capacity, in allowing the State to use the expert as its own rebuttal witness, and in allowing the State to elicit testimony that the psychiatrist was originally retained by the defense. We affirm the conviction.

FACTS
Defendant Roderick Hamlet was convicted of first degree assault committed in July 1993. At that time, Defendant had been a member of the Seattle police force for over 19 years. He was a former Marine who had served in the Vietnam war where he was wounded in combat three times. He suffered from post traumatic stress disorder as a result of his war experiences and his service as a police officer, and had been treated for this disorder prior to the assault.
On July 8, 1993, Defendant and his wife were involved in an argument at the family home. According to Defendant's wife, Freddie Hamlet, Defendant picked up a gun in their bedroom and pointed it at her head, saying "Today you are going to go to heaven." Verbatim Report of Proceedings (RP) at 190. She testified she said "so be it," left the room and went outside, and Defendant followed her. While they were outside, a family friend, Raymond Washington, arrived to pick up keys which the Hamlets were holding for him. According to Washington, Defendant said "So you're the man that's here to stop us." RP at 190. Washington replied, "I don't know what you are talking about. I just came to pick up my keys." RP at 190-91. Defendant said "I lost everything. I lost it now. I lost everything." RP at 112. Defendant then pointed a gun at Washington and ordered him to start walking, to leave. Washington did, but then was ordered to return. When Washington saw that Hamlet was very tense, he turned and ran. Defendant fired several shots at him, hitting him several times. Police responded quickly to numerous 911 calls. Defendant dropped the two guns he was carrying and was arrested.
On July 13, 1993, Defendant was charged with first degree assault for shooting Washington. Later the information was amended to add a charge of second degree assault on his wife Freddie.
About one month after the shooting, the defense retained a psychiatrist, Dr. George Christian Harris, to examine Defendant for purposes of a possible mental status defense. On August 13, 1993, Dr. Harris interviewed Defendant. In December 1993, the defense had psychiatrist Dr. John Liebert interview Defendant. Following Dr. Liebert's evaluation, the defense notified the State that the defense would rely on a claim of diminished capacity and that Dr. Liebert would testify in support of the defense. Although counsel revealed that another expert had interviewed Defendant, counsel did not disclose Dr. Harris's name, explaining that the second expert would not be called as a witness. The State moved for disclosure. The trial court granted the motion and ordered disclosure of the name of the nontestifying expert, and his written reports, tests, and notes, and permitted the State to conduct an oral interview of the expert. The court ordered that the discovered information could not be used at trial unless Defendant presented a diminished capacity defense. Further, the court ordered that no discovery would be allowed of written communication between defense counsel and the expert. Defendant moved for direct discretionary review by this court, which was denied. Defense counsel then disclosed Dr. Harris's name. The prosecutor spoke with Dr. Harris, and also had Defendant evaluated by a third expert, Dr. McFall.
Prior to trial, Defendant moved for exclusion of evidence that the defense had originally retained Dr. Harris. The motion was denied.
At trial, the State's evidence tended to show that Defendant was angry about his relationships with his wife and children, and was jealous of Washington's role in the family's life, particularly with regard to Defendant's wife.
Defendant presented Dr. Liebert's testimony that Defendant suffers from severe post traumatic stress disorder resulting from his Vietnam service and his experiences as a police officer. Dr. Liebert described specific *1029 events Defendant flashed back to during the confrontation with Washington. Dr. Liebert concluded that Defendant was in at least a partially dissociative state at the time of the shooting and therefore his mental capacity to form specific intent at the time of the shooting was substantially impaired. Defendant testified, describing events in Vietnam and comparing them to his encounter with Washington, and identifying incidents while a police officer which caused flashbacks to Vietnam experiences. He described Washington as a "bad troop" he was trying to stop.
At the close of the defense's case, a stipulation was read to the jury which stated that the defense retained Dr. Harris in 1993 to evaluate Defendant, and after receiving Dr. Harris's report learned of Dr. Liebert's expertise in post traumatic stress disorder and retained him to evaluate Defendant.
In rebuttal, the State called Dr. Harris, who testified that Defendant had described arguing with his wife about Washington the night before the shooting, and a threat by his wife to throw him out of the house. Dr. Harris testified Defendant said he thought Washington was going to challenge him when he drove up. Defendant did not describe his Vietnam experiences to Dr. Harris. Based upon his evaluation, Dr. Harris concluded that Hamlet was not in a dissociative state at the time of the shooting. He found no evidence that Defendant suffered from any mental condition which would excuse or minimize his behavior. Dr. McFall similarly testified that based upon his evaluation, Defendant was not experiencing a dissociative state at the time of the shooting. He testified that Defendant told him that he aimed low so as not to kill Washington, and his memory of the incident was very good, both being inconsistent with the claim of being in a dissociative state at the time.
The jury found Defendant guilty of first degree assault for shooting Washington, but found him not guilty of assaulting his wife. The Court of Appeals affirmed. State v. Hamlet, 83 Wash.App. 350, 921 P.2d 560 (1996), review granted, 131 Wash.2d 1005, 932 P.2d 644 (1997). The Washington Association of Criminal Defense Lawyers has filed an amicus curiae brief in support of Defendant.

ANALYSIS
Defendant contends the order requiring disclosure of Dr. Harris's name and his opinions and the State's use of Dr. Harris as a rebuttal witness violate the attorney-client privilege and the Sixth Amendment right to counsel. The State maintains these issues have already been decided adversely to defendant in this court's decision in State v. Pawlyk, 115 Wash.2d 457, 800 P.2d 338 (1990). We agree.
In Pawlyk, the court held that regardless of whether the defense intends to call as a witness a psychiatrist who examined the defendant for purposes of a possible insanity defense, the State may discover the psychiatrist's written reports and opinions and may call the psychiatrist as its own witness to rebut expert testimony offered by the defendant in support of an insanity defense. Defendant contends that Pawlyk is distinguishable from this case because there the defendant asserted an insanity defense, while here Defendant claims diminished capacity. Amicus curiae Washington Association of Criminal Defense Lawyers (WACDL) also maintains Pawlyk is distinguishable, and alternatively argues that Pawlyk should be overruled.
Defendant reasons that in the case of an insanity defense, the burden of proof is on the defendant to prove insanity by a preponderance of the evidence. State v. Box, 109 Wash.2d 320, 745 P.2d 23 (1987). In contrast, Defendant argues, diminished capacity is an affirmative defense only to the extent that the Defendant has the burden of producing some evidence of diminished capacity, but that once the issue is raised the State bears the burden of proving the absence of the defense beyond a reasonable doubt.
Although the burdens of proof of insanity and diminished capacity are different, the difference is not a basis on which Pawlyk can reasonably be distinguished. First, the criminal discovery rule, CrR 4.7, does not distinguish between insanity as a defense and diminished capacity. State v. Hutchinson, *1030 111 Wash.2d 872, 880, 766 P.2d 447 (1989). Second, Pawlyk was not decided on the burden of proof, but instead is based on the State's need for evidence, which may be the best and most accurate evidence of a defendant's mental state, once defendant places that mental state at issue. The need for such evidence is just as great in the case of diminished capacity as it is in the case of insanity. Cf. State v. Brewton, 49 Wash.App. 589, 591-92, 744 P.2d 646 (1987) (distinction between burdens of proof of insanity and diminished capacity not relevant to issue whether the defendant waived physician-patient and Fifth Amendment privileges once defendant injected mental condition into case; assertion of privilege would deprive the State, and ultimately the jury, of important evidence on that issue).
Defendant raises several additional arguments, each of which was addressed and rejected in Pawlyk. Defendant has cited no authority requiring reversal of that decision.[1]
Amicus WACDL expressly asks the court to overrule Pawlyk, arguing that under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the right to assistance of a psychiatrist precludes disclosure to either the State or the court. WACDL also urges that assertion of a mental status defense does not automatically waive the right to counsel.
The Court in Ake held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Ake, 470 U.S. at 83, 105 S.Ct. at 1096. The Court said that through the "process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense." Id. at 80-81, 105 S.Ct. at 1095. The Court noted, however, that psychiatry is not an exact science, and psychiatrists frequently disagree on what constitutes a mental illness, on the appropriate diagnosis, and on cure and treatment. Id. at 81, 105 S.Ct. at 1095. "By organizing a defendant's mental history, examination results and behavior, and other information, interpreting it in light of their expertise, and then laying out their investigative and analytic process to the jury, the psychiatrists for each party enable the jury to make its most accurate determination of the truth on the issue before them." Id. The court concluded:
[W]ithout the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witness[], the risk of an inaccurate resolution of sanity issues is extremely high. With such assistance, the defendant is fairly able to present at least enough information to the jury, in a meaningful manner, as to permit it to make a sensible determination.
Id. at 82, 105 S.Ct. at 1096.
Ake does not address the issue of confidentiality. The opinion is aimed at assuring that defendant has the necessary psychiatric assistance, rather than to questions of the State's access to the information generated during a psychiatrist's examination of a defendant. Ake specifically concerns appointment of a psychiatrist for an indigent. It *1031 does not prohibit disclosure of any psychiatrist's evaluation of the defendant. See Granviel v. Lynaugh, 881 F.2d 185, 191-92 (5th Cir.1989), cert. denied, 495 U.S. 963, 110 S.Ct. 2577, 109 L.Ed.2d 758 (1990) (psychiatrist's examination is not an adversary proceeding; availability of a neutral expert provides a defendant with materials integral to build an effective defense; defendant has no right under Ake and due process to confidential assistance of the expert, but instead the expert's opinion and testimony is available to both sides).
Here, Defendant's right to the assistance of a competent psychiatrist was not violated. Dr. Harris and Dr. Liebert both examined Defendant at defense's request, and Dr. Liebert testified at trial on his behalf. The jury had before it both parties' experts' "organiz[ations of the] defendant's mental history, examination results and behavior, and other information, interpret[ed] in light of their expertise," and information about "their investigative and analytic process" so the jury could "make its most accurate determination of the truth on the issue before them." Id. at 81, 105 S.Ct. at 1095.
WACDL also claims that the right to counsel is not automatically waived by asserting a mental status defense. Pawlyk is not contrary. Pawlyk, 115 Wash.2d at 468, 800 P.2d 338. In Pawlyk, the court noted that most courts rejecting a Sixth Amendment challenge to disclosure do not do so on the basis of waiver. Id. at 468, 800 P.2d 338. Further, this court noted the admonition in Powell v. Texas, 492 U.S. 680, 684-85, 109 S.Ct. 3146, 3149-50, 106 L.Ed.2d 551 (1989), cert. denied, ___ U.S. ___, 116 S.Ct. 54, 133 L.Ed.2d 19 (1995) that a defendant does not automatically waive his right to counsel merely by asserting an insanity defense. Pawlyk, 115 Wash.2d at 468, 800 P.2d 338. Pawlyk did not hold that the right to counsel is waived. The court instead held that the right is not violated by disclosure.
Consistent with Pawlyk, we hold that neither the attorney-client privilege nor the Sixth Amendment right to counsel is violated by the ordered disclosure of the name of the nontestifying expert retained by the defense for purposes of a diminished capacity defense, and his written reports, tests, and notes, as well as an oral interview, nor by the State calling that expert as a State's witness to rebut evidence of a diminished capacity defense.
Defendant next claims that this court should reverse and remand for a new trial because the trial court erred in denying his motion to exclude evidence that Dr. Harris was originally retained by the defense. He argues this evidence is not relevant and its disclosure violated the attorney-client privilege and his Sixth Amendment right to counsel. The State contends that the evidence is relevant because it showed lack of bias, and that the probative value of the evidence outweighed its prejudicial effect. The Court of Appeals held the evidence was admissible.
Admissibility of evidence lies within the sound discretion of the trial court and the court's decision will not be reversed absent abuse of that discretion. State v. Markle, 118 Wash.2d 424, 438, 823 P.2d 1101 (1992). Under ER 402 all relevant evidence is admissible subject to constitutional requirements, statutory provisions, the rules of evidence and other rules and regulations in Washington. Relevant evidence is evidence which has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. ER 403 provides for exclusion of relevant evidence if it is unduly prejudicial.
The State argues that the fact the defense originally retained Dr. Harris is relevant on the issue of bias because it showed Dr. Harris was not predisposed to support the State's position. We agree the evidence is relevant.
Even if relevant, evidence is not admissible under ER 402 if admissibility is barred on constitutional, statutory, or rule grounds. Defendant argues that the decisions whether to employ a particular expert and to call the expert are part of the appropriate defense strategy, and thus fall within the attorney-client privilege. Further, Defendant maintains that under Pawlyk, the evidence that *1032 the defense originally retained Dr. Harris falls within the protection of the work product doctrine because the State does not have exceptional need for this evidence. Defendant further argues that RPC 1.6 provides that this information shall not be revealed because it is a secret relating to representation.
Defendant's arguments are inconsistent with the court's view of the attorney-client privilege and the work product doctrine analysis in Pawlyk. The attorney-client privilege does not apply to protect the name and reports of the expert. The work product rule codified in CrR 4.7(f)(1) protects from disclosure "legal research or ... records, correspondence, reports or memoranda to the extent that they contain the opinions, theories or conclusions of investigating or prosecuting agencies except as to material discoverable under subsection (a)(1)(iv)." CrR 4.7(a)(1)(iv) concerns reports or statements of experts made in connection with the case, including results of mental examinations. The court in Pawlyk held under these provisions there was no work product protection for such materials where prepared by a defense-retained expert the defense did not intend to call as a witness. Pawlyk, 115 Wash.2d at 477-78, 800 P.2d 338. It follows that the expert's name and the fact that Defendant retained him are not protected either. Moreover, we do not agree that the name of that expert, and whether he or she is retained by the defense fall within "opinions, theories or conclusions" of defense counsel.
Amicus WACDL argues the defense decision to hire Dr. Harris is protected by the constitutional rights to counsel and due process. WACDL reasons that the right to counsel includes the right to confidentiality of defense counsel's decision to consult expert witnesses, and cites several cases for the proposition that allowing the jury to learn that defense retained the expert is unduly prejudicial. Then, WACDL argues, it is a violation of due process to force defendant to give up another constitutional right, i.e., the right to confidentiality in consulting experts.
In Pawlyk, we rejected the defendant's argument that the attorney-client privilege is part of the Sixth Amendment right to counsel. Pawlyk, 115 Wash.2d at 469, 800 P.2d 338. Moreover, cases which WACDL cites addressing issues of potential prejudice have not identified this concern as being founded in the Sixth Amendment. Finally, as explained above, we do not agree with WACDL's argument that Ake requires nondisclosure. WACDL's argument based on the Sixth Amendment right to counsel and due process is unpersuasive.
The evidence that Dr. Harris was originally retained by defense counsel is not barred as a matter of law on the grounds of attorney-client privilege, the work product doctrine, or the constitutional rights to counsel and to due process. The next question is whether the evidence was unduly prejudicial. Even if relevant, evidence should be excluded if its probative value is outweighed by its prejudicial effect.
Several courts have commented on the potential prejudice if the jury is informed that a psychiatrist called as a witness by the prosecution was originally retained by the defense. These include courts which, like this court in Pawlyk, have held that the State is entitled to discovery of the defense-retained psychiatrist's reports and opinions and to call the psychiatrist as a State's witness. E.g., Lange v. Young, 869 F.2d 1008, 1014 (7th Cir.), cert. denied, 490 U.S. 1094, 109 S.Ct. 2440, 104 L.Ed.2d 996 (1989); United States ex rel. Edney v. Smith, 425 F.Supp. 1038, 1053 (E.D.N.Y.1976), aff'd without opinion, 556 F.2d 556 (2d Cir.), cert. denied, 431 U.S. 958, 97 S.Ct. 2683, 53 L.Ed.2d 276 (1977); State v. Schneider, 402 N.W.2d 779, 788-89 (Minn.1987), cert. denied, 510 U.S. 1080, 114 S.Ct. 901, 127 L.Ed.2d 93 (1994). The court in Schneider stated:
[I]t is usually not relevant in determining the defendant's insanity whether a psychologist examined the accused at the behest of the defense. Experts are not the paid harlots of either side in a criminal case and should not be portrayed in such a light. Normally, any relevance to the disclosure that one or the other side hired a particular expert would be outweighed by *1033 the risk of unfair prejudice and, therefore, exclusion would be warranted under Minn. R. Evid. 403. Yet, there can be no flat prohibition of such disclosure because the identity of an expert may, at times, be relevant.
Schneider, 402 N.W.2d at 788. Some courts which do not allow discovery of a defense-retained psychiatrist do so in part because of the "prejudice inherent in disclosing to the trier of fact that the source of this adverse testimony is an expert originally employed by the defendant." State v. Pratt, 284 Md. 516, 398 A.2d 421, 425 (1979); see also, People v. Knuckles, 165 Ill.2d 125, 209 Ill.Dec. 1, 8, 650 N.E.2d 974, 981 (1995); see also Stephen A. Saltzburg, Privileges and Professionals: Lawyers and Psychiatrists, 66 Va. L.Rev. 597, 645-46 (1980).
We agree. The jury in this case was invited to infer that the psychiatrist who had the best opportunity to evaluate the defendant was rejected because his conclusion was adverse to defendant's claim of diminished capacity. The jurors may have believed that the defense tried to keep relevant information from them through not calling that psychiatrist, and was able to support its mental status claim only after "shopping" for a favorable expert. Another unacceptable consequence of informing the jury that the expert was originally retained by the defense is that the jury could assume that Dr. Harris was the more credible witness because the State called him even though he had originally been retained by the defense.
The State in this case says that the stipulation read to the jury about why Dr. Harris was not called ameliorated any prejudice.[2] However, the evidence should not have been admitted in the first place because of possible prejudicial effect, and Defendant should not have been put in the position of having to provide an explanation to the jury of why Dr. Harris was not called.
We conclude that it was an abuse of discretion to admit testimony that Dr. Harris was first retained by the defense. The next question is whether admission of this testimony is reversible error. Where nonconstitutional harmless error occurs in admitting evidence, reversal is not required unless there is a reasonable probability that it affected the verdict. State v. Owens, 128 Wash.2d 908, 914, 913 P.2d 366 (1996); State v. Copeland, 130 Wash.2d 244, 287, 922 P.2d 1304 (1996).
Here, reversal is not required. Dr. Harris was the first expert to examine Defendant, about a month after the assault occurred. Yet Defendant did not tell Dr. Harris about any flashbacks or associations with experiences in Vietnam, as he later reported to Dr. Liebert. Although Defendant testified and explained that he was embarrassed to discuss his post traumatic stress disorder and the relationship between the past and the assault, the clear inference the jury was likely to draw was that Defendant altered his version of events by the time he saw Dr. Liebert. Regardless of who had retained Dr. Harris, the fact is that Defendant gave different information to the experts, thus casting considerable doubt on Defendant's credibility. Further, Dr. McFall testified that, based upon his evaluation, Defendant was not experiencing a dissociative state at the time of the shooting. Dr. McFall particularly noted that Defendant told him that he aimed low so as not to kill Washington and that Defendant's memory of the incident was very good. Dr. McFall said both of these factors are inconsistent with being in a dissociative state at the time of the assault.
In addition, evidence from other witnesses tended to show that Defendant was angry about his relationships with his wife and children, and jealous of the victim's influence with his wife. There was evidence that Defendant thought the victim was interfering in his family life. The night before the incident, Defendant's wife had threatened to throw him out of the house, and there was testimony that the argument that night centered on the victim's involvement with Defendant's family. There was also evidence that *1034 the victim was planning to move into the house next door to Defendant, and was attacked when he stopped to pick up the keys to that house. Under these circumstances, we cannot say there is a reasonable likelihood that the testimony that Dr. Harris was originally retained by the defense affected the verdict.
Affirmed.
DURHAM, C.J., and DOLLIVER, SMITH, GUY, ALEXANDER, JOHNSON and TALMADGE, JJ., concur.
SANDERS, Judge, dissenting.
I cannot agree it is "harmless" error to allow the jury to consider evidence otherwise inadmissible because it is unduly prejudicial.[1] Prejudicial evidence is not harmless evidence.
The "harmless error" doctrine requires reversal whenever there is a reasonable likelihood that inadmissible evidence affected the jury's verdict. State v. Owens, 128 Wash.2d 908, 914, 913 P.2d 366 (1996); State v. Copeland, 130 Wash.2d 244, 287, 922 P.2d 1304 (1996). Conclusions of harmless error based upon this reasonable likelihood inquiry amount to little more than speculative appellate fact-finding.
Jurors and courts are made up of human beings, whose condition of mind cannot be ascertained by other human beings. Therefore, it is impossible for courts to contemplate the probabilities any evidence may have upon the minds of the jurors. The state attempts to safeguard the life and liberty of its citizens by securing to them certain legal rights. These rights should be impartially preserved. They cannot be impartially preserved if the appellate courts make of themselves a second jury and then pass upon the facts.
State v. Robinson, 24 Wash.2d 909, 917, 167 P.2d 986 (1946) (emphasis added). See also State v. Finnegan, 6 Wash.App. 612, 622, 495 P.2d 674 (quoting State v. Macon, 57 N.J. 325, 273 A.2d 1, 9 (1971), review denied, 81 Wash.2d 1001 (1972), cert. denied, 410 U.S. 967, 93 S.Ct. 1450, 35 L.Ed.2d 702 (1973)).
Both state and federal constitutions guarantee the right to have a jury resolve factual issues. Coppo v. Van Wieringen, 36 Wash.2d 120, 121, 217 P.2d 294 (1950) (citing WASH. CONST. art I, § 21); U.S. CONST. amend. VI. Yet the majority uses the harmless error doctrine to displace the jury with unreflecting alacrity. State v. Pam, 30 Wash.App. 471, 477, 635 P.2d 766 (1981) (Ringold, J., dissenting), aff'd, 98 Wash.2d 748, 659 P.2d 454 (1983). Such judicial "second-guessing" rests in pure conjecture as this court can never be privy to precisely what evidence appealed to individual jurors much less the jury as a collective body. See State v. Valentine, 132 Wash.2d 1, 21, 935 P.2d 1294 (1997); Phillips v. City of Seattle, 111 Wash.2d 903, 911-12, 766 P.2d 1099 (1989); Dennis J. Sweeney, An Analysis of Harmless Error In Washington: A Principled Process, 31 Gonz. L.Rev. 277 (1995-96).
Even assuming a "reasonable likelihood" inquiry is ever appropriate, this error was certainly not harmless. This case warrants reversal because here there is much reason to believe this admittedly prejudicial evidence likely affected this verdict.
*1035 The court must presume the jury considered all the evidence before it, Zukowsky v. Brown, 79 Wash.2d 586, 603, 488 P.2d 269 (1971), and courts generally recognize psychiatric testimony impresses a jury. Ake v. Oklahoma, 470 U.S. 68, 81-82, 105 S.Ct. 1087, 1095-96, 84 L.Ed.2d 53 (1985) (quoting F. Lee Bailey & Henry B. Rothblatt, Investigation and Preparation of Criminal Cases § 175 (1970)). Credible psychiatric testimony is critical to prove the defense of diminished capacity. Id. When inadmissible evidence clearly undermines the credibility of an expert witness and occupies the center of a party's case, much more than a reasonable probability exists that such evidence affected the verdict. How can the majority confidently claim otherwise?
Here the majority finds it was inherently prejudicial to inform the jury that the source of adverse prosecution testimony was an expert originally retained by the accused, Majority at 1033; yet the majority concludes it was "harmless" error to do so. How something can be inherently prejudicial and harmless all at the same time is beyond my comprehension.
Three psychiatric experts testified at trial. Of those, the disclosure affected the credibility of at least two by enhancing the credibility of Dr. Harris for the prosecution at the expense of the credibility of Dr. Liebert, for the defense. The majority admits such disclosure clearly invited the jury to infer Dr. Harris was the more credible and encouraged the jury to give additional weight to his testimony at the expense of the defense witness. Majority at 1033. Disclosure also suggested the defense hid relevant information. In effect it actually forced the defense to "involuntarily vouch" for Dr. Harris' credibility. See United States v. Walker, 910 F.Supp. 861, 864 (N.D.N.Y.1995).
Informing the jury Dr. Harris was first retained but then rejected as a defense witness likely impugned the testimony of Dr. Liebert as well. By inferring the defense had to "shop" for a favorable opinion the jury could have easily inferred Dr. Liebert testified simply as instructed by the defense, thus further undermining his credibility.
Claimingactually speculatingthe error was harmless, the majority argues the accused compromised his credibility by allegedly failing to tell Dr. Harris about his flashbacks. Majority at 1033-1034. The majority also asserts the defendant was angry or jealous of Mr. Washington and that Dr. McFall's testimony precludes any reasonable probability that the jury's verdict was affected. Majority at 1033. But the jury might conclude otherwise. The defendant testified he did not disclose his flashbacks to Dr. Harris out of embarrassment. More importantly, the defendant testified he experienced traumatic events during his service in Vietnam and as a police officer.[2] He was diagnosed with post traumatic stress disorder, a disorder which could have caused dissociation prior to the assault. Finally, the testimony of Dr. McFall, the third expert at trial, does not eliminate the prejudicial impact of the inadmissible evidence as the inadmissible evidence affected the testimony of two out of three experts.
In reality we cannot second-guess the jury nor can we determine precisely what evidence affected the verdict in what way. But we can be certain that psychiatric expert testimony played a crucial role in the outcome, and the inadmissible disclosure went to the very heart of the defense. For these reasons, I cannot conclude the error was merely harmless and would reverse and remand this case for a new trial.
NOTES
[1] We recognize there is a split of authority on the issue of whether the attorney-client privilege is violated by discovery of a defense-retained psychiatrist on the issue of a mental status defense where the expert does not testify for the defense. State v. Pawlyk, 115 Wash.2d 457, 464, 800 P.2d 338 (1990). For example, a Colorado case cited in Pawlyk, Miller v. District Ct., 737 P.2d 834 (Colo.1987), held that the attorney-client privilege applied. Since Pawlyk was decided, however, the Colorado case has been superseded by statute and the Colorado Supreme Court has held the attorney-client privilege under the new legislation does not bar discovery from a nontestifying defense-retained psychiatrist. Gray v. District Ct., 884 P.2d 286 (Colo.1994), cert. denied, 514 U.S. 1084, 115 S.Ct. 1797, 131 L.Ed.2d 725 (1995). In contrast, the court in People v. Knuckles, 165 Ill.2d 125, 209 Ill.Dec. 1, 650 N.E.2d 974 (1995) found a violation of the attorney-client privilege. The split of authority existed when Pawlyk was decided, however, and was previously considered by the Pawlyk court.
[2] In its brief to the Court of Appeals the State originally argued that Defendant waived any challenge to testimony that Dr. Harris was originally retained by the defense because of this stipulation. However, the State withdrew this argument after examining a report of proceedings which made apparent that Defendant had not waived his challenge.
[1] I concur in the majority's decision that State v. Pawlyk, 115 Wash.2d 457, 800 P.2d 338 (1990), governs this case and permits disclosure of the name of the nontestifying defense expert, his written reports, tests, notes, and oral interview. Pawlyk also allows the State to call that expert as a rebuttal witness. However the wisdom of Pawlyk is questionable.

Stare decisis requires "[o]nce this court has decided an issue of state law, that interpretation is binding until we overrule it." Hamilton v. Department of Labor & Indus., 111 Wash.2d 569, 571, 761 P.2d 618 (1988). Therefore for Pawlyk to be overruled as the Washington Association of Criminal Defense Lawyers requests, a clear showing must be made that the "established rule is incorrect and harmful before it is abandoned." In re Stranger Creek, 77 Wash.2d 649, 653, 466 P.2d 508 (1970). Pawlyk's original dissent persuasively argued the criminal rules do not support this type of discovery and the attorney-client privilege and work-product doctrines prevent such disclosure. Moreover, in retrospect, the factual predicate of Pawlyk insofar as it relates to multiple psychiatric evaluations is based upon pure conjecture and unsupported speculation. See Pawlyk, 115 Wash.2d at 462-63, 800 P.2d 338. I doubt it would pass scrutiny under Frye v. United States, 293 F. 1013, 34 A.L.R. 145 (D.C.App.1923).
[2] Defendant served as a United States Marine Corps rifleman in Vietnam. During his tour of duty, he was wounded three times in combat and received three Purple Hearts. He also served as a Seattle police officer for over 19 years.